The appellant was charged by indictment with having "forcibly ravished S_____ E________ M_____, a woman," etc. (R. p. 206) Appellant's case was called for trial in the Circuit Court on July 25, 1978. The jury returned a verdict of guilty, fixing punishment at imprisonment for a term of appellant's natural life. Thereafter, the trial judge set sentence in accordance with this verdict. From the denial of his motion to exclude, a request for the affirmative charge and motion for new trial, appellant prosecutes this appeal.
The prosecutrix, Mrs. S____ M_____ S_____, stated that, on March 4, 1978, her name was S____ E________ M_______ Mrs. S_____ testified that, on the night of March 3, she had arranged for someone to sit with her two children in her home while she was out of the house. In the early morning hours of March 4, the prosecutrix left her house to take a friend to work at a local tavern. After leaving her friend at work, the prosecutrix drove back to her house, checked on her children, and again left to go to the home of Mr. J____ S_____, her fiance at that time. On the way to Mr. S_____' house, at approximately 3:15 a.m., the prosecutrix noticed an automobile following close behind her with its high-beam headlights blinking on and off. The prosecutrix's immediate response was to stop her automobile and retrieve her driver's license from her purse. During her search for her driver's license, the prosecutrix's door was opened from the outside, whereupon she turned and viewed the person who had opened the door.
At this point, defense counsel requested and was granted voir dire examination of the witness concerning her pretrial lineup identification of the appellant. The prosecutrix stated that, on March 7, she identified the appellant as her assailant from a group of five men. Defense counsel objected to further testimony concerning her identification of appellant on the ground that appellant was not represented by counsel at the lineup, which objection was overruled.
Upon resumption of direct examination, the prosecutrix identified in court the appellant as her assailant. The prosecutrix stated that appellant tried to pull her out of her automobile but she kicked and struggled to resist. Appellant grabbed her feet and pulled her out of the front seat, causing her head to hit the street. The blow temporarily stunned the prosecutrix, allowing appellant *Page 1177 
to place her in the front seat of his automobile. The prosecutrix recalled that the engine in appellant's automobile, in contrast to that of her own, had not been shut off. When appellant had opened the prosecutrix's door, he reached in and seized her keys.
The prosecutrix was thrown into appellant's automobile from the driver's side in such a way that appellant was able to use his right arm to prevent her from seeing where they were going. After appellant had driven for several minutes, the prosecutrix was able to look out of the automobile long enough to recognize a familiar water tower. At one point, the prosecutrix attempted to escape from appellant by exiting through the passenger door while they were moving. Appellant pulled the prosecutrix back into the automobile by the hair on her head. During her escape attempt, the prosecutrix's feet were badly injured from being dragged on the pavement while hanging out of the door.
Approximately one minute before stopping, the appellant turned onto a dirt road. After he stopped the automobile, appellant told the victim to take off her clothes; she refused. Appellant then forced the prosecutrix to have sexual intercourse with him against her will. Afterwards, the appellant returned the prosecutrix to her automobile and gave her keys back to her. As the appellant drove away, the prosecutrix could see his automobile well enough to describe it later for the police.
The prosecutrix immediately reported the incident to Officer Eulan Holland of the Dothan Police Department. From the Police Department, the prosecutrix was taken to the hospital where a pelvic examination was performed on her. Thereafter, the prosecutrix and Sergeant West of the Dothan Police Department attempted to locate the scene where the incident had occurred. The prosecutrix was able to recall several landmarks that she had seen when the appellant was returning her to her automobile. At length, the prosecutrix and Sergeant West found the dirt road where the incident occurred. From there, the prosecutrix went back to Police Headquarters and assembled a composite picture of appellant's face, using transparent plastic overlays.
On March 7, the prosecutrix identified the appellant in a lineup and identified appellant's automobile parked at another location as being the same one used by her assailant. The prosecutrix selected appellant's voice from a tape recording of several voices as being the voice of her assailant.
Dr. James M. Jones, Jr., testified that he examined the prosecutrix on March 4, 1978, in the emergency room at Flowers Hospital. Qualification of Dr. Jones as an expert by testimony concerning his educational background and experience was stipulated by both parties. Dr. Jones' external examination revealed: multiple abrasions on the hands, feet and back; contusions in multiple places on her body; and a hematoma on the left side of her head.
Dr. Jones' internal pelvic examination confirmed the prosecutrix's statement that she had been using tampon sanitary protection at the time of the assault; the tampon was compressed in the posterior vagina. The results of a gynecological smear and culture were negative. Dr. Jones found no internal injuries.
Officer Eulan Holland testified that he was working at Dothan Police Headquarters on March 4, 1978, at approximately 4:20 a.m., when the prosecutrix entered to complain that she had been raped. Officer Holland was allowed to testify as to the details of the prosecutrix's description of her assailant, his automobile, and his dress. After recording this information, Officer Holland called a detective, Sergeant West.
On cross-examination, Officer Holland stated that the prosecutrix, though upset, was coherent during her account of the incident. Officer Holland stated that the prosecutrix's clothing was torn and in disarray.
Sergeant William West of the Dothan Police Department testified that, on March 4, 1978, he was called to investigate the prosecutrix's complaint. Sergeant West described *Page 1178 
the way in which the prosecutrix put together a composite of her assailant's face. A photostatic copy of the composite was admitted into evidence over defense counsel's objection.
Sergeant West was allowed to relate to the jury the prosecutrix's descriptions of her assailant, his automobile, and his dress over objection by the defense. Photographs of the prosecutrix's injured feet taken by Sergeant West at the police station on the morning of March 4, 1978, were admitted into evidence by the trial judge.
Sergeant West testified that, on March 7, 1978, in response to a radio communication, he went to the home of appellant. There he observed an automobile matching the description given by the prosecutrix of her assailant's automobile. Sergeant West asked appellant to come to Police Headquarters to appear in a lineup. The appellant voluntarily complied. Prior to his appearance in the lineup, appellant was informed by Sergeant West of his Miranda rights and, specifically, that he was entitled to have an attorney present during the lineup. According to Sergeant West, appellant did not request that an attorney be provided him.
On voir dire examination, defense counsel attempted to show that appellant had not voluntarily participated in the lineup and that no attorney was available had appellant requested one. At the close of the inquiry, the trial judge overruled defense counsel's objection to admission of any testimony about the lineup.
Sergeant West's testimony concerning the prosecutrix's lineup identification of appellant as her assailant, her identification of appellant's automobile as the one used by her assailant, and her location of the scene of the incident substantially corroborated the prosecutrix's earlier testimony concerning these events. At the scene of the incident, Sergeant West took several photographs of tire tread tracks in the dirt, which were admitted into evidence. The tread pattern of the tracks at the scene matched the pattern of the tires on appellant's automobile as shown by other photographic evidence. Sergeant West noted that there was only one set of automobile tire tracks at the scene where the prosecutrix said the incident occurred.
Sergeant West stated that he found two toboggans in appellant's automobile when it was taken into custody, which matched the prosecutrix's description of the one her assailant had been wearing during the alleged assault. During the inspection of appellant's automobile, a sample of the seat cover and a sample of the carpeting were removed for testing at the State Crime Laboratory.
Richard Dale Carter, Director of the Department of Toxicology and Criminal Investigation in Enterprise, Alabama, testified that he received several pieces of evidence and took several photographs in connection with his investigation of the instant case. Mr. Carter identified photographs of the tires on appellant's automobile. These photographs were subsequently admitted into evidence by the trial judge.
Mr. Carter decided to have serological analysis performed on the carpet sample and the seat cover sample because of the reddish brown stains which were on them. These tests were conducted by Mr. William Landrum of the Department of Toxicology and Criminal Investigation in Auburn, Alabama. For comparison purposes, samples of the prosecutrix's blood, as well as that of the appellant (obtained by court order), were also sent to Mr. Landrum by Mr. Carter. The proper chain of custody was established for each of these items.
Forensic Serologist William Landrum of the Alabama Department of Toxicology and Criminal Investigation in Auburn, Alabama, testified that he analyzed blood samples and other evidence in connection with the instant case. Mr. Landrum's qualifications as an expert in his field were stipulated by the parties. The results of Mr. Landrum's tests revealed that the groupings of the blood on the carpet sample taken from the front floorboard area of appellant's automobile were the same as the groupings of the blood of the prosecutrix; the groupings of the blood on the plastic seat cover *Page 1179 
taken from the front seat back of appellant's automobile were the same as the groupings of the appellant's blood.
The first witness called for the defense was the appellant. The gist of the case for the defense was alibi. Appellant claimed to have been at a tavern in Ashford, Alabama, until approximately 3:15 a.m. when he left for home. Appellant listed the names of several people with whom he had spent the evening. Three of these people, Mable Bolden, Elizabeth Phillips, and Frankie Anderson testified that in fact they had been with the appellant until he left at approximately 3:15 a.m. Appellant stated that his wife was in bed asleep when he arrived. Appellant admitted ownership of the automobile identified by the prosecutrix as being the one driven by her assailant. Appellant said that he saw the prosecutrix for the first time at the preliminary hearing on March 17, 1978.
Appellant offered proof that his wife's blood type was the same as that found on the carpet sample taken from the front floorboard area of his automobile. Appellant did not know how long the blood had been on the carpet before it was discovered by the police.
Calvin McLoyd, the appellant's brother, was called to the stand to point out discrepancies between appellant's automobile and certain details of the prosecutrix's description of her assailant's automobile. These discrepancies were the subject of several witnesses' testimony on rebuttal. However, their substance presents questions for the jury.
Sergeant West, recalled to the stand, testified that, on March 7, 1978, when he went to appellant's house to ask him about his whereabouts on the night of the incident, West did not notice any scratches or marks on appellant's arms or face. The prosecutrix had testified earlier that she scratched and bit her assailant during the affray.
At the close of the evidence, the defense moved to exclude the State's case on the ground of insufficient evidence. The trial judge overruled this motion and then delivered his oral charge to the jury.
 I
Appellant argues error to reversal occurred when the trial judge allowed Officer Holland and Sergeant West to testify as to the details of the prosecutrix's complaint. The relevant portion of Officer Holland's testimony follows (R. pp. 53-54):
 "Q. And did she tell it to you the first time, or did she have to repeat it?
 "A. No, sir. She walked in the door — as soon as she saw me, she told me that she had been raped.
"MR. SMITH: Objection.
"THE COURT: Yes.
 "MR. MARTIN: It's the Res Gestae. Within minutes after she got away from the man, Your Honor.
 "THE COURT: I would sustain it for the time being, until the time is established.
"Q. What time was that?
"A. About 4:25. 4:20, somewhere along in there.
"MR. MARTIN: I renew the offer.
"MR. SMITH: And we renew our objection.
"THE COURT: I would overrule the objection.
 "Q. From there, did you proceed to take her statement down?
"A. Yes, sir.
"Q. Did she describe her assailant to you?
"A. Yes, sir.
 "Q. And did she describe any vehicle that might have been involved in it?
"A. Yes, sir.
"Q. And did you take down that information?
"A. Yes, sir.
 "Q. And what information did she give you about her assailant?
 "MR. SMITH: We object to the information that she gave to the officer.
"THE COURT: I would overrule.
 "A. She said he was a black male, 25 to 30 years of age, from 5 11 to 6 foot 2 tall, 175 to 185 pounds; he had a toboggan on his head, and had a full beard. He had *Page 1180 
on a light colored shirt, just work clothes, it wasn't — it was casual clothes. Wasn't dress clothes.
 "Q. Did you get the description of any vehicle that may have been involved in it?
"A. She said she knew it was an Impala Chevrolet.
 "MR. SMITH: We are going to object. Renew our objection.
"THE COURT: Overruled.
 "A. She said she knew it was an Impala Chevrolet. Asked her what color it was, and she said it had a light color top and a grey bottom. She thought it was a grey bottom. It was either a white top or — either a cream top. And, had two doors on it."
In Langford v. State, 54 Ala. App. 659, 312 So.2d 65 (1975), this Court stated:
 "There seems to be no disagreement between the parties on appeal as to the well established principles in rape and related cases well stated in McElroy, Law of Evidence in Alabama, (2d ed.) § 178.01 as follows:
 "`The mere fact of making complaint is always admissible in support of the testimony of the woman. Lacy v. State, 45 Ala. 80; Smith v. State, 47 Ala. 540; Barnett v. State, 83 Ala. 40, 3 So. 612; Gaines v. State, 167 Ala. 70, 52 So. 643.
"`. . .
 "`The details or particulars of a complaint cannot be shown by the prosecution in the first instance. Therefore, complaints specifying the identity of the person accused, or specifying the injuries claimed to have been received, or otherwise specifying the minute circumstances of the offense are not admissible. Barnett v. State, 83 Ala. 40, 3 South [So.] 612; Hall v. State, 248 Ala. 33, 26 So.2d 566 . . .'"
That portion of the record above-quoted would readily seem to be inadmissible according to the principles of law stated. However, careful examination reveals that appellant failed to make a specific objection stating the grounds on which such was based. There is no question about the portion of Officer Holland's testimony to which the objection was addressed. InLangford, supra, under circumstances very similar to those herein presented, failure to state the grounds on which the objection was based resulted in this Court's ruling that the issue was not properly preserved for appellate review.
In Small v. State, Ala.Cr.App., 348 So.2d 504, aff'd, Ala.,348 So.2d 507 (1977), the Alabama Supreme Court implicitly condemned the form of objection, to wit: "I object to that information," as being a general objection insufficient to present the hearsay issue for appellate review. Appellant's objection in the instant case suffers from this same defect. Accordingly, we find that the hearsay issue herein is not properly presented for our review.
The relevant portions of Sergeant West's testimony appear in the record as follows (R. pp. 57, 58-59):
 "Q. When she gave you a description of the assailant, what did you proceed to do, with reference to working up a description of him?
"A. I made a composite.
 "Q. I show you here State's Exhibit # 1, and ask you what that is?
"A. That's the composite.
"Q. Is that a picture of the composite?
"A. That's a photostat of it, yes, sir.
 "Q. Will you explain to the jury what a composite is, as used by you, in working up an identification?
 "A. It's a series of transparent plates, with different face features and so forth involved on it, and you put it together in a sequence, to resemble a particular person. It's not a picture, it's just a resemblance of them.
"Q. And how did you do that? Who was directing you?
"A. Mrs. M. . . .
* * * * * *
 "Q. In the course of your investigation that morning, in the first interview, did she give you a description of any vehicle that might have been involved in this?
"A. Yes, sir. *Page 1181 
"Q. Did you take down that information?
"A. Yes, sir.
"Q. And do you have that there?
"A. Yes, sir.
"Q. What did she give you that morning?
"A. She said it was an old model —
"MR. SMITH: We object to what she said.
"THE COURT: Overruled.
 "A. She stated it was an older model Chevrolet, she could read the name of Impala on the dashboard. She said it had a real loud muffler on it, and that it was a dark bottom with a light colored top, and that it had three or four taillights on the rear end of the car; and that it had torn seat covers. Real heavy torn plastic seat covers."
The objection to Sergeant West's testimony is a general objection which is insufficient to present the hearsay issue for appellate review. Since the testimony is clearly not inadmissible for any purpose, the trial court will not be put in error for overruling the general objection. Small v. State, Ala.Cr.App., 348 So.2d 504, aff'd, Ala., 348 So.2d 507 (1977);Langford v. State, 54 Ala. App. 659, 312 So.2d 65 (1975).
Aside from the procedural fault in appellant's presentation of the hearsay issues, appellant has failed to show any resulting prejudice "to his substantial rights," as required by Rule 45, Alabama Rules of Appellate Procedure. In earlier testimony by the prosecutrix, the substance of her descriptions of appellant and his automobile were admitted during direct examination. Prejudicial error may not be predicated upon the admission of evidence which has been admitted without objection or motion to exclude at some other stage of the trial. SeeLangford v. State, 54 Ala. App. 659, 312 So.2d 65 (1975), and cases therein cited; Thompson v. State, 53 Ala. App. 484,301 So.2d 248, and cases cited therein.
 II
Appellant argues the State failed to establish that the pretrial lineup was not so unnecessarily suggestive as to taint the prosecutrix's in-court identification of appellant. Appellant argues that the pretrial lineup was illegal because he did not have an attorney present when it was conducted.
Sergeant West described the lineup procedure on direct examination as follows (R. pp. 61-62):
 "Q. When you got down to the police station, did you advise the defendant of what was taking place? What kind of investigation was taking place?
"A. Yes, sir.
 "Q. Did you give him any advice as to his constitutional rights?
"A. Yes, sir.
"Q. What rights did you advise him of?
 "A. That he didn't have to make a statement. That anything he said could be used against him in Court. And then — all the Miranda warnings.
"Q. Did you ask him if he wanted a lawyer?
"A. Yes, sir.
 "Q. Or, rather, did you tell him he was entitled to have a lawyer present?
"A. Yes, sir.
"Q. Did you ask him to be in a line-up?
"A. Yes, sir.
"Q. What did he say?
"A. He agreed to it.
 "Q. And did you, on that date — incidentally, what date was this?
"A. On the 7th of March. On a Tuesday.
"Q. Did you then arrange to have a line-up?
"A. Yes, sir.
 "Q. Would you explain to the jury how that line-up was composed?
 "A. We had several black males, all approximately the same age and size. And, Sergeant Locke was outside with the males, and they were lined up in a sequence, with a number in front of them. And she identified the number as being the one —." *Page 1182 
The record reveals that appellant did not request the presence of an attorney. His participation in the lineup, for aught that appears in the record, was voluntary. Furthermore, the other participants in the lineup were of the same sex, race, age range, and size as appellant, all of which leads us to discount the allegation of suggestiveness in the lineup procedure.
In Thomas v. State, 50 Ala. App. 227, 278 So.2d 230 (1973), this Court stated:
 ". . . The line-up was not tainted and the circumstances do not show an unfairly constituted line-up, nor was it shown to have been conducted in such an unnecessarily suggestive manner as to be conducive to irreparable mistaken identification. Even if the line-up were to be thought to be violative of due process, the in-court identification need not be rejected if it is shown to have a source independent of the line-up. We are of the opinion that there was sufficient evidence before the trial court, some already alluded to, to show that the in-court identification by the rape victim had an independent origin, hence, fulfilling the legal requirements. United States v. Wade, supra; Houston v. State, 49 Ala. App. 403, 272 So.2d 610; Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402; Redmon v. State, 47 Ala. App. 421, 255 So.2d 604.
 "Had the defendant not been represented by counsel at the preliminary and the line-up held on day following the crime, there still would be no error. In Houston v. State, supra, we said:
 "`The defendant also argues that error was committed because the defendant did not have counsel at the time of the line-up.
 "`The United States Supreme Court in the recent case of Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411, * * *, stated:
 "`". . . it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him. * * *"
 "`The Court held that a routine police investigation prior to the filing of formal charges, preliminary hearing, indictment, information or arraignment, as in this case, is not a formal prosecutorial proceeding, and, therefore, prior cases holding that a defendant is entitled to counsel at any "critical stage of the prosecution" do not apply.' Houston v. State, supra."
That the prosecutrix's in-court identification of appellant was based on a source of independent origin is illustrated by the following portion of her testimony on direct examination (R. pp. 11-12, 13):
 "Q. All right. Now, with your billfold in your hand, I want you to tell what happened next?
"A. My car door opened.
"Q. Who opened it?
"A. The person on the outside.
"Q. And did you see that person?
 "A. At that point, I did. I turned around and I saw that person.
"Q. What part of that person's body did you see?
 "A. I would say from the waist up. Maybe their head, you know, arms and hands. Face.
"Q. Did you see that person's face?
"A. Yes, sir.
"Q. Did you see that person's facial hair?
"A. Yes, sir.
"Q. And did you see his dress?
"A. Yes, sir.
 "Q. All right. Do you see that person in the Courtroom right now?
* * * * * *
"Q. Who was the person that you saw there?
 "A. Outside my car, was Raymond McLoyd. (Witness indicating)
"Q. And were you pointing at someone then?
 "A. The man right there, behind — in the Courtroom. (Indicating)
 "Q. You are pointing at the man sitting behind his lawyer here, at the same table that I'm sitting at? *Page 1183 
"A. Yes, sir."
Thus, we find no error associated either with the pretrial lineup identification or with the in-court identification of the appellant.
 III
Appellant argues that the admission of the following testimony from the prosecutrix on direct examination was error (R.p. 33):
 "Q. On the occasion of the line-up, were you asked to listen to a voice tape, or was something said about his voice? Did you say something about his voice?
"A. I listened to a voice tape.
"Q. All right.
"A. Of several voices.
 "Q. Did you hear a voice like the one you heard that night?
 "A. Yes, sir. I pointed that particular one out to him.
"MR. SMITH: We object to that answer.
"THE COURT: What are your grounds?
 "MR. SMITH: To what she pointed out to someone else, without the defendant being present, is hearsay, Your Honor.
"THE COURT: Overruled."
In brief, appellant cites us to cases dealing with the relationships between pretrial identifications and in-court identifications. However, appellant's objection was grounded on the familiar hearsay doctrine.
It is well settled that all grounds for objection not specified are waived and the trial court will not be put in error on grounds not assigned. Whiddon v. State, 53 Ala. App. 280, 299 So.2d 326 (1973). Therefore, we do not address ourselves to this argument.
 IV
Appellant argues that the trial court erred in refusing to grant his motion for new trial on the ground that one of the jurors spoke to Elaine Love, a court clerk, while the jury was in deliberation of its verdict. Ms. Love's testimony at the hearing on the motion follows (R. pp. 195-196):
 "A. I was leaving the Courtroom, to go to a witness room, to strike a jury.
"Q. Yes.
 "A. And I met a lady in the hall, just before you get to this door here.
"Q. Right out of the Courtroom?
"A. Uh-huh.
"Q. What did she say?
 "A. She said she had a question that she needed to ask. And I asked her what was the question, and she said she needed to know how much time a person had to serve before they could get paroled. And, at that time, I asked her if she was on the jury now deliberating.
"Q. And what did she say?
"A. She said she was.
 "Q. And was that the jury that was out deliberating on Raymond McLoyd's case?
"A. Yes."
The testimony of the juror, Ms. Berry, follows (R. pp. 201-203):
 "Q. Mrs. Berry, were you on the jury that tried Raymond McLoyd for rape?
"A. I was.
"Q. That was back in July of this year?
"A. Right.
 "Q. Mrs. Berry, after the jury went out to deliberate, do you recall leaving the jury room for a moment?
 "A. Yes, I did come out. We had reached a verdict, but there was a question asked, and we wanted to ask the judge something.
 "Q. So you were looking for the judge when you came out?
"A. Right.
"Q. And do you recall seeing a lady in the hall?
"A. Yes.
"Q. And asked her a question about it?
"A. Uh-huh.
"Q. She did not give you any information, did she?
"A. No.
 "MR. SMITH: We are going to object to him leading the witness, now.
"THE COURT: Oh, go ahead. *Page 1184 
 "Q. Let me ask you this: Did you at any time, discuss this case with anyone out in the hall, to talk to anyone about this case whatsoever, after you left the jury room?
"A. I did not.
 "Q. Did you see Mrs. Love immediately after coming out of the jury room?
"A. Yes.
 "Q. And after you saw her, were you immediately placed back in the jury room?
"A. Right.
 "Q. And during that time, did you talk to anyone else besides her?
"A. No, I did not.
 "Q. And did you discuss this case with anyone whatsoever?
"A. I did not.
"MR. SORRELLS: Your witness.
"CROSS EXAMINATION
"BY MR. SMITH:
"Q. Mrs. Berry, did anyone else leave the jury room?
"A. No.
"Q. That you know of?
"A. No, they did not.
 "Q. And you came out of the jury room, then you immediately ran into Mrs. Love?
"A. Right.
 "Q. You did not speak to anyone, other than Mrs. Love?
 "A. I said I wanted to ask a question, and she heard me.
"Q. Were you talking to her when you said that?
"A. Uh-huh.
 "Q. I see. And then, without speaking to any other person in the hallway, you went back into the jury room?
"A. That's right.
"Q. For deliberation?
"MR. SMITH: All right. That's all we have.
 "THE COURT: Did I understand you correctly to say that before you came out of the jury room, that the jury had already reached a verdict?
"A. They had.
 "THE COURT: Had anybody been out of that jury room before you reached a verdict?
"A. No.
 "THE COURT: And the verdict was already reached by the jury?
"A. Right.
"THE COURT: When you came out?
"A. It was."
In Belcher v. State, Ala.Cr.App., 325 So.2d 195, cert. quashed, Ala., 325 So.2d 199 (1975), this Court quoted Palmorev. State, 283 Ala. 501, 218 So.2d 830 (1969), which stated the rule:
 ". . . [T]hat a separation of the jury, after the trial has been entered upon and before verdict, creates a cause for reversible error in favor of defendant unless the state affirmatively shows that defendant was not injured thereby. Lynn v. State, 250 Ala. 384, 386, 34 So.2d 602.
 "Such separation pending a trial is not necessarily ground for a new trial but is sufficient to show a prima facie right to it, and the burden is upon the state, after such separation is shown, to prove that the jurors conversed with no one affecting the prisoner's guilt and that no other influences were exerted which may have biased their deliberations. . . ."
In the instant case, the State positively showed that the defendant was not injured as a result of this separation. Thus, no error is shown.
We have carefully reviewed the record in this case and find same to be free of error. This case is due to be and is hereby
AFFIRMED.
All the Judges concur. *Page 1185